OPINION,
That the goods and merchandize, sold and delivered by the plaintiff Carter Brax-ton to the said Eendall Southerland, between the years one thousand seven hundred and seventy six, and one thousand seven hundred and eighty, one, ought not to be discounted, at the money prices then charged, against a debt contracted before the commencement of that period; but ought to be discounted at their true value, which, in this case, may be nearly perhaps ascertained by reducing those prices according to the scale for proportioning the depre-tiation of paper money; that the payments made to the said Eendall Southerland, by the plaintiff Carter Braxton, not appearing to have been directed by him, at the times of payment or before, to be entered to his credit in that account wherein he is made a debitor for the bill of exchange, the said Eendall Southerland might enter them to-the credit of the plaintiff Carter Braxton in any other account subsisting between those parties; and that for the principal money, damages, and charges, due by the protested bill of exchange, in consequence of the settlement thereof made the twenty eighth day of february, in the year one thousand seven hundred and seventy six, the said Fendall Southerland was intitled to no more than seven hundred and seventy eight pounds seven shillings and four pence, o ~ current money of Virginia, with interest thereon, at the rate of five per centum per annum, from the first day of June thence next following, and pronounced this
DECREE,
That the defendent be perpetually injoined from proceeding further on the judgment of the general court recovered by his testator, the said Eendall Southerland, against the plaintiff James Hill, except as to two hundred and twenty five pounds eighteen shillings five pence and three farthings, of current money of Virginia, appearing by the account, stated according to the principles of this decree from the accounts annexed to the report, to have been due to the said Fendall Southerland the seventh day of december, in the year one thousand seven hundred and eighty four, with interest thereupon from that time; and except also as to the costs in the action at common law: *and that the plaintiffs do *135 pay one half, and the defendents do pay the other half, of the costs allowed to the commissioner.
The opinion and decree of the court of appeals the 29 day of October 1792:
1'he court is of opinion, that the application of the appellants to a court of equity for relief in this case was proper, notwithstanding- they might have defended themselves at law not only because the omission of such defence proceeded from mistake or accident, but on the ground of original jurisdiction, to establish the agreement between the parties, made on the twenty eighth day of february, 1776, and to be relieved against the unconscionable and oppressive use made of the judgment, by directing the execution to be levied for one thousand and forty three pounds nineteen shillings and one penny three farthings, when it appears that the utmost of the said Southerlands clame thereon was not more than two hundred and twenty five pounds eighteen shillings and five pence three farthings, with interest from the seventh day of december, 1734, and therefore that there is no error in so much of the said decree as sustains the suit for relief; but that there is error in the relief afforded, not only in the adjustment of the quantum, but in the application of it, as between the appellants, therefore it is decreed and ordered, that the decree aforesaid be reversed arid annulled, and that the appellee pay to the appellants their costs by them expanded in the prosecution of their appeal aforesaid here, and this court, proceeding to make such decree as the said high court of chancery ought to have made, is of opinion, that (without contravening the rule giving creditors the right of application of payments made indefinitely to either of different debts due at the time) from the combined circumstances in this case, the whole of Butlers and Ililliards bonds, amounting to nine hundred and thirty five pounds fifteen shillings and one penny, ought to be. applied to the credit of the protested bill, since it is evident that the payer so intended it; and that if the receiver did not assent thereto, yet he did not make such a recent and proper application of it otherwise, as ought to controul the choice of the payer; and therefore that the application ought to stand as stated in the first account of the master commissioner. on viewing this account however a doubt arose, whether the mode of staling interest was a proper one, whereupon one of the judges, declaring himself affected, in his character of an administrator by a decision of the question, retired from the discussion; and the court, discovering it to be of small importance in its operation in the present case, chose to pass it over on the ground of the masters report not having been excepted to, or the. point argued in court; with this caution to avoid an inference *of approbation, rather than by a decision either way to establish a precedent which in other cases might be important, and it appearing by the said state, that the sum of thirty four pounds seventeen shillings and nine pence farthing only, was due on the protested bill, on the seventh day of december, 1784, and the court being of opinion, that the appellant Hill is not concerned with the other parts of the dispute, unless he could have derived an additional credit therefrom: therelore it is decreed and ordered, that, upon payment of the said thirty four pounds seventeen shillings and nine pence farthing, and interest from the time last mentioned till paj'Mient, and the costs of the judgment at law, the said appellant retaining thereout his costs in chancery and this court, the injunction stand and be perpetual, but on failure in such payment that the injunction be dissolved as to, and that the appellee be at liberty to sue out execution for, so much as he is intilled to by this decree, the court then proceeded to consider the remaining parts of the dispute, as between the appellee and the appellant Braxton, and is of opinion, that an account for goods, not delivered or accepted as a payment, nor liquidated between the parties, ought not 1o be taken as a payment in paper, so as to stand at the nominal value, according to the strict words of the act of assembly, but viewed in the light of a set off, and to be adjusted, especially in equity, upon just principles; that in this proceeding the court is of opinion, that the legal scale, so far as it operates in the years 1777 and 1778, is not a. just rule in itself, not corresponding with the general opinion of the citizens at the time as to depretiation ; nor does the scale at any period give a proper rule for fixing the price of imported goods, which was influenced by the expense and risque of importation, as well as by the depretiation of the paper; that therefore the account of the appellant Braxton for goods delivered, to the end of the year 1778, ought, at the nominal value, to be set off against the principal and interest of Claibornes bond and Southerlands account; and that so much of the residue of his account, as will pay off the interest of the balance remaining due to Souther-land, ought also tobe set off at the nominal sum; but that the residue of the amount of the said account ought to be subject to the legal scale, for may, 1780, of sixty for one, and at that reduced rate set off against the principal of Southerlands debt; a precedent for such distinction, between principal and interest havirg, as is supposed, been furnished in this court, the court proceeding to correct the account of the master commissioner, upon these principles, find a balance due from the said Braxton to the said Southerland, of seventy pounds and four pence on the thirtieth day of april, 1783. and as the said Braxton, by applying to a *'court of equity for an account has subjected himself, though plaintiff, to a decree for the balance found due from him, it is decreed and ordered, that he pay to the appellee the said sum of seventy pounds and four pence, with interest from the said thirtieth day of april, 1783, till *136 payment, retaining1 thereout his costs in chancery and this court.*
*REMARKS:
The doctrine contained in this proemium to the latter decree, that the application of the appellants to a court of equity for relief in this case was proper, notwithstanding they might have defended themselves at law, not only because the omission of such defence proceeded from mistake or accident, but on the ground of original jurisdiction to establish an agreement between the parties, and to be relieved against the unconscionable and oppressive use made by one of them of a judgment he had recovered against another of them, was not controverted in the present case, nor is recollected to have been controverted for almost two centuries before it in any other case, and is thought not to have required at this day grave discussion and the sanction of a solemn decision.
The words, there is no error in so much of the said decree (that is, the decree of the high court of chancery) as sustains the suit for relief, seem an approbation of something done by the judge of that court in sustaining the suit for relief: but if by any effort of him the suit for relief was sustained, the effort must have been like the vis inertiae, for he was inert in sustaining the suit for relief as the ground, whereon the capitol stands, is inert in sustaining that edifice.
Whether in the reversed decree error be in the relief afforded, *not only in the adjustment of the quantum, but in the application of it, will now be inquired.
The case as to the error in the application of relief afforded was:
Carter Braxton, indebted to Rendall Southerland on account of a protested bill of exchange, and also on account of a bond, having assigned to him some securities, which were accepted for the same value as if they had been payments in money of the principal debts with interest due b3* the securities, clamed a credit for these payments in the account of the bill of exchange.
Rendall Southerland claimed the right to apply the payments, first to the credit of the debt on account of the bond, .and the surplus, for they exceeded it, to the credit of the debt on the other account.
The H. C. C. in delivering its opinion did not enounce the rule of law, which governs cases of this kind, in the form of an axiom, but exemplified it in these terms: that the payments made to the said Feudal Southerland, by the plaintiff Carter Brax-ton, not appearing to have been directed by *137 him, at the times of payment, or before, to be entered to his credit in that account wherein he is made a debitor for the bill of Exchange, the said Eendall Southerland might enter them to the credit of the plaintiff Carter Braxton in any other account subsisting between those parties.
The argument included in this opinion is an enthymema, an imperfect syllogism, in which one of the propositions was suppressed, because being supposed to be known by men of jurisprudence, and not more contestable among such men, than a self-evident truth is contestable among other men, it was understood.
If the argument be cast in the figure of a perfect syllogism, the major proposition would be: by law, if a debitor, who oweth money on several accounts, making payments, do not, at the times of payments, or before, direct in which of those accounts the payments shall be entered to his credit, the creditor may enter the payments to the credit of the debitor in any other account subsisting between those parties.
The minor proposition would be: but Carter Braxton, who owed money on several accounts, vis;, on account of a bill of exchange protested, and on account of a bond, making payments, did not, at the times of payments, or before, direct that to his credit on account of the protested bill of exchange the payments should be entered.
And the conclusion would be: therefore the creditor, Eendall Southerland, might enter the payments to the credit of the debitor, Carter Braxton, on account of the bond.
*With this conclusion the reversed decree accorded.
It is said to be erroneous, and if it be so, it must be erroneous, either because the major proposition is false: or because the minor proposition is false: for if those premisses be true, the conclusion is unavoidable ; and the decree, accoiding with it, cannot be erroneous.
Those who condemned the decree of error have not denied the major proposition, but instead of denying are supposed to have admitted it; for
Their words are- this court is opinion that (without contravening the rule giving creditors the right of application of payments made indefinitely to either of different debts due at the time) from the combined circumstances in this case, the whole of Butlers and Hilliards bonds ought to be applied to the credit of the protested bill, upon which is observable, 1 the existence of some rule, giving creditors the right to apply payments made indefinitely to either of different debts due at the time, is in terms admitted ; 2 they do not state here, or in any other place, what that rule is; and 3 the particle ‘the’ connected with ‘rule,’ the rule, must allude not to ANY rule, but either to some rule in their contemplation, unknown to others, or to some rule stated or understood in the opinion, which was at that time the subject of their animadversion.
That the allusion was to some rule in their contemplation, locked up in their breasts, or deposited among their arcana (a) they surely would not wish men to believe; and if that were not the rule to which they alluded, the rule must be that which was stated or understood in the opinion of the H. C. C. ; that rule, the explication whereof is the major proposition, and which they say do not contravene, and, if not contravene, certainly not deny, and consequently they admit the major proposition, that by law, if a debitor who oweth money on several accounts, making payments, do not, &c.
If this major proposition be true, the decree of this court was not erroneous, unless the minor proposition be false; so that whether it be so or not, or, in other words, whether Carter Braxton did, at the times of the payments or before, direct that to his credit, on account of the bill of exchange, the payments should be entered? is the only remaining question in this part of the case.
This is a question of fact and consequently depending on evidence; but without making observations on the evidence, the facts shall be admitted to be as they are stated to be by the *court of appeals, with this caution, nevertheless, that this admission is not to include an admission that the operation of law upon those facts is as that court hath affirmed it to be, for that cannot be admitted.
Then the question is reduced to this whether those facts, considered separately or conjunctly, evince, of themselves, or by operation of law, Carter Braxton’s direction to apply the payments to his credit on account of the bill of exchange?
1. The court of appeals say, he, Carter Braxton, so intended; to which an obvious answer is, an intention is not a direction, unless at the time of payment or before the intention had been communicated to the receiver, these circumstances indeed combined would have been a complete direction; but a prior or concurrent communication, one of the essentials, is not alleged or pretended to be proved.
2. The court of appeals next words are, and that if the receiver (Eendall Souther-land) did not assent thereto, yet he did not make such a recent and proper application of it, otherwise, as ought to control the choice of the payer.
The method of answering this sentence most conveniently seems to be by commenting on the several members of it.
If the receiver did not assent thereto.] assent to what? to the intention of Carter Braxton to apply the payment to the credit of the protested bill; now Carter Braxton, at the time of making the payment, or be *138 fore, not having communicated his intention to Eendall Southerland, how could he know it? and if he did not know on what subject Carter Braxton was meditating, or what he intended, how could Eendall Southerland assent to it? seems a question not of easy solution. ■
He did not make such a recent and proper application of it as ought to controul the choice of the payer.] on these words the best comment will be an explanation of the principles, on which the legal doctrine of those elections, which are the subject of the present disquisition, are supposed to be founded.
It seems not an arbitrary, but rational doctrine, founded on these principles: whilst a man retaineth the money, whereof he had legally acquired the possession, the money being his own property, is subject to his uncontrouled power; he may conceal it, before the face of his creditor may squander it, melt it in a crucible, sink it in the ocean ; in a word may do with it what he will; therefore when he delivereth it, even to a creditor, with an instruction to apply it in a particular manner, the receivers possession is fiduciary, and he is bound to make the prescribed application, e. g. if A, indebted to B. and C, deliver money to B. directing him to pay it to C, the money in the hands of *B. is the property of C. for the same reason, if A be indebted to B on two or more several accounts, the money delivered by A to B, with direction to place it to the credit of A in this or that account, is received by B under a trust, in which is implied, if not in terms declared, an obligation to place the money accordingly.
On the other hand when the debitor de-livereth the money, which before was his property, to the creditor, without instruction to apply it to the credit of this or that account, the property is changed immediately to the receiver, who, so soon as it is in his possession, is complete owner of it; it is his own money: if it be his own money by what law is he bound to make a recent application of it, or an application which is called a proper application, or by what law restrained from exercising the same power over it which he can exercise over any other part of his own property?
Hence the election of the one, the payer, is prior to or concomitant with the payment, the election of the other, the receiver, is posterior to the payment.
Controul the choice of the payer.] the meaning of these words as they are here combined with the context cannot be developed. If the choice of Carter Braxton, or his power to direct the application of the credit, determined by the payment without that direction, at the time or before, which is thought to be admitted, or to be proven, if not admitted, that such a choice, a choice no longer existing after the payment, was controulable, the supposed possibility of which is implied in the words, yet he did not make such a recent and proper application of it, otherwise, as ought to controul the choice of the payer, seems incomprehensible.
The argument of the court of appeals then, which is the subject of the preceding commentary, amounts to this: these circumstances, namely, the intention of Carter Braxton, that the payment made by him should be applied to his credit in a particular account, and Eendall Souther-lands not making, after the payment, such a recent and proper application of it to Carter Braxtons credit in another account as ought to controul the choice, which he had before the payment, to direct the credit to be applied to which account he pleased, but which choice doth not appear to have been communicated to Ifendall Souther-land ; that is, the circumstance of an undisclosed intention or choice of one party, and the circumstance of a neglect in the other, to do something recently and properly, in opposition to that undisclosed intention or choice, are circumstances, which, combined together, produce the destruction of a creditors right *to apply payments indefinitely made to either of different debts due at the time, or are equivalent to a direction by the debitor that the payments should be applied to his credit in a particular account I now the art of combining the secret thought of one man’s mind with the doing of nothing by another man, so as to produce this effect, is believed not to have been before discovered.
Algebraists indeed, in resolving problems by equations, frequently use zero or nothing, and are much assisted by it; but they do not pretend that any quantity is augmented or diminished by adding to it or subtracting from it nothing; on the contrary W. Emerson, who in a dispute with the monthly reviewers was a zealous stickler and struggled vehemently for his nothings, admitted, that 0+9=9, or 9 combined with 0 is no more than 9. but according to this decree, Carter Braxtons undisclosed intention, which of itself doth not produce a certain effect, combined with 0, doth produce that effect.
The facts deserving attention in the other part of the case, where the decree of the H. C. C. is declared to be erroneous, that is, in the quantum of relief which it afforded, are those:
Carter Braxton, having in february, 1776, executed a bond for payment of 1221. 11s. 9J+ to E. Southerland, sells to him in September of 1777, in june, September, and december of 1778, and in may of 1780, sundry merchandises, charging for them the current paper money prices of those times, and now clameth credit for them accordingly against the bond, which they with interest almost double; whereas the prices reduced by the scale with interest would be less than twenty nine pounds, the account is as follows;
*139 WYTHE Hii.i, ¶. Gkicgory &c. 84 86
£ s. d.
1777 sept. 10 bushel salt 8
1778 june. 2 pair cards 7
sept, a loaf sugar 9-1 at 12s. 5 8 9
2 lb twine 12
2 tumblers 12
2 ditto 18
1 ivory comb 18
thread 11 9
46 lb. tarred rope at 4s 9 4
98 lb. sein twine at 6s.29 8
15 lb. sugar 4 10
4 lb. coffee 1 4
-53 6 6
1778 dec. 10Y?, bushels salt at 70s. 36 15 *1880 may. 59 lb. iron sent by
Harrys flatt at 80s. 142 10
247 11 6
F. Southerland objected against the allowance of such a credit, except so much of it. as was equal to a small account of his own against C. Braxton for merchandise, sold to him and charged in a like manner, insisting that the credit for the residue of the goods ought not to excede the true value of them, against a bond for money, due before the commencement of depretiation.
The H. C. C. sustained the objection, being of opinion the goods ought to be discounted at the true value, and for ascertaining the value referred to the statutory scale of depretiation; not because it was thought a measure of legal obligation in the case of goods sold, but because, at that time, no other measure, which seemed more just, occurred, as the language of the opinion indicates. another mode more regular, for ascertaining the value of goods in such a case as this, will be mentioned hereafter.
The court of appeals accommodate the controversy thus: they allow part of C. Braxtons account to be set off, at the nominal value, against the bond, and F. Southerlands account; they allow part of the residue to set off some interest due to Southerland, at the nominal sum; and they allow the remainder, reduced by the scale, to be set off against the principal of F. Southerland’s account.
This accommodation is the result of certain propositions, stated in their opinion, which is the foundation of the reversing decree, this opinion will be examined, in order to inquire whether from such premises such conclusions are deducible.
The first paragraph of the opinion is, an account for goods not delivered or accepted as payment, nor liquidated between the parties, ought not to be taken as payment in paper, so as to stand at the nominal value, according to the strict words of the act of assembly, but viewed in the light of a set off, and to be adjusted, especially in equity, upon just principles.
Out of this paragraph, so far as the present question is affected by it, might have been exterminated the words, 1 not delivered or accepted as a payment, 2 nor liquidated between the parties, and 3 especially in equity, but let them remain.
The next paragraph of the opinion is, the legal scale, so far as it operates in the years 1777 and 1778, is not a just rule in itself, not corresponding with the general opinion of the citizens at *’the time, as to depreciation ; nor does the scale, at any period, give a proper rule for fixing the price of imported goods, which was influenced by the expense and risque of importation as well as by the depretiation of the paper.
Immediately after which occur these conclusions, introduced with the word therefore, 1 that the account of the appellant Braxton for goods delivered to the end of the year 1778 ought, at the nominal value, to be set off against the principal and interest of Claibornes bond (that is C. Brax-tons bond in which Claiborne was his surety) and Southerlands account; 2 and that so much of the residue of his account as will pay off the interest of the balance, remaining due to Southerland, ought also to be set off, at the nominal sum, but 3 that the residue of the amount of the said account ought to be subject to the legal scale for may, 1780, of sixty for one, and at that reduced rate set off against the principal of Southerlands debt: to which is subjoined, a precedent for such distinction between the principal and interest having, as is supposed, been furnished in this court.
The two paragraphs contain four distinct propositions; but between any one of theta and the conclusions, or any one of the conclusions, or between the propositions and all or any of the conclusions, doth not occur one single instance of a middle term, (b) to connect the extremes together, this middle term shall be supplied occasionaly.
The first general proposition: an account for goods not delivered or accepted as payment, nor liquidated between the parties, ought not to be taken as a payment in paper, so as to stand at the nominal value, according to the 'strict words of the act of assembly.
Middle-term; but Carter Braxtons account is an account for goods, not delivered or accepted as a payment, nor liquidated between him and F. Southerland.
One would expect this conclusion : therefore C. Braxtons account for goods ought not to be taken as a payment in paper, so as to stand at the nominal value, according to the strict words of the act of assembly.
But what is the conclusion of the court of appeals? either none at all, or one or two of all these three; 1 therefore the account of the appellant Braxton, for goods delivered to the end of the year 1778, ought at the nominal value to be set off against the principal and interest of Claibornes bond and Southerlands ^account, *140 2 and that so much of the residue of his account as will pay off the interest of the balance remaining due to Southerland, ought also to be set off at the nominal sum, 3 that the residue of the amount of the said account ought to be subject to the legal scale for may, 1780, of sixty for one, and at that reduced rate set off against the principal of Southerlands debt.
By what form of ratiocination can one or two or all of these conclusions be deduced from that proposition? if neither, why was it stated?
II Proposition: an account for goods ought to be viewed in the light of a set off and to be adjusted, especially in equity, upon just principles.
Middle-term; but Carter Braxtons account is an account for goods.
The rational conclusion is; therefore Carter Braxtons account ought to be viewed in the light of a set off, and to be adjusted, especially in equity, upon just principles.
The conclusion in the reversing decree is therefore the account, &c.
A man, of' ordinary understanding, must see the chasm between the second proposition and these conclusions, and that the chasm ought to be supplied by an intermediate proposition in some such form as this; to set off an account for goods, sold during the period of depretiation, at the nominal value, that is at the prices charged in the account, against a debt, contracted before the commencement of depretiation, is to adjust an account for goods, especially in equity, upon just principles.
If such an intermediate proposition had been stated,’ it is denied to be true; yet without it, or some others tending to affect the same thing, that the conclusions, at least the first and second conclusions, can be connected with the second proposition, is likewise denied : and in the first denial an appeal is made to all men who have adequate ideas of justice; and in the other denial an appeal is made to all men who are not destitute of the reasoning faculty, and are accustomed to exercise it, if they be not in the habit of obsequious submission to judgements, than which they have been taught to think their own less correct.
III Proposition is, the legal scale, so far as it operates in the years 1777, and 1778, is not a just rule in itself, not corresponding with the general opinion of the citizens at the time as to depretiation.
Before the enquiry what conclusion is deducible from this proposition, a commentary upon its terms may not be improper.
The legal scale, so far as it operates in the years 1777, and 1778, is not a just rule.] the scale in this case was legaly obligatory, *or not legaly obligatory; if the latter, it ought to be totaly rejected ; if the former, the statute, which authorised it, having declared, that it should be a rule for determining the value of certain things, during a period of five years, when the court of appeals will not allow it to operate during two of those years, 1777, and 1778, as they do not in their first and second conclusions, but allow it to operate in a subsequent year 1780, as they do in their third conclusion ; is this exercising the power properly belonging to the judiciary department?
The scale is not a just rule in itself.] A rule may be unjust by allowing either too much or too little, whether its injustice be in its excess or defect we are not told here, nor told any where else, unless it may be said to be in the next proposition, or in the first and second conclusions, if we look for this information in the next proposition, that indeed may be said to imply, but not directly to affirm, that the scale valued goods imported less than was just; and to look into a conclusion for that which ought to be predicated in the premisses, is not a logical mode of investigation, and is unsatisfactory to a candid inquirer, as well as preposterous; for a conclusion ought to be a deduction from what was asserted in the premises for its support, not, like the spider, to contain in its own bowels that which it .is to spin for its support.
Nor corresponding with the general opinion of the citizens at the time as to depre-tiation.] let us suppose Carter Braxton to have sold to J. S. an ivory comb the last day of december, 1778, and another of the same value, in 1780, charging 18 shillings for each ; according to this opinion of the court of appeals, they would have allowed him to set off, against a bond given to J. S. three or five years before, one of these combs at 18 shillings, and the other at 18 pence, and would have called this, in their language, an adjustment on just principles. Carter Braxton possibly might have thought it so, but that any citizen besides the judges of appeal might have thought so, the commentator doth not kn.ow. he doth not even recollect what he thought about depretiation at that time his self — possibly he was asleep when the year 1778 ended and its successor began its revolutions — be that as it may, he inclines to believe that he thought or dreamed that depretiation, if he thought or dreamed at all about it, was the same on the new years day of 1779, as it was the day before.
But supposing the third proposition to be unexceptionable, the legal scale, so far as it operates in the years 1777 and 1778, is not a just rule in itself, not corresponding with the general opinion of the citizens, at the time as to depretiation, the rational ^Conclusion from it is, therefore reject the scale, because, so far as it operates in the years 1777 and 1778, it is not a just rule, not corresponding with the general opinion of the citizens at the time, as to depretiation, and substitute some other rule which, so far as it operates in the years 1777 and 1778, is a just rule, corresponding with the general opinion of the citizens at the time, as to depretiation. the conclusions of the court of appeals are therefore the account, &c.
But to connect these conclusions with *141 that proposition must be admitted, or proved, this middle proposition : for estimating the value of goods, sold in the years 1777 and 1778, in order to set off a debt, contracted before the commencement of de-pretiation, the rule, just in itself, and corresponding with the general opinion of the citizens at the time, as to depretiation, is the nominal value, that is the prices charged by the seller in his account of the goods.
That the court of appeals have proved the truth of this intermediate proposition is not admitted, nor will the truth of it be admitted, before they or others prove, that one peny weight of gold, 22 carxats line, is equal in value to live or more peny weights of gold, of the same degree of fineness.
IV Proposition: nor does the scale, at any period, give a proper rule for fixing the price of imported goods, which was influenced by the expense and risque of'importation, as well as by the depretiation of the paper.
This proposition is the same as the last, appearing in another garb, which betrayeth a weakness of argument undiscovered in that.
The supposed difference is, that the goods mentioned now are imported, the price of which was influenced by the expense and risque of importation, then the seller augmented his retailing price accordingly ; and consequently the difference vanisheth.
The weakness of argument is thus betrayed ; depretiation of the paper is acknowledged to be one cause, and was in truth the sole cause, which influenced that price of goods, about which the question is; for in the true value the expense and risque of importation is included.
But if depretiation were only one of the causes, ought the seller alone to experience the beneficial effects of it? if the seller, who was a debtor, had the advantage of de-pretiation, by augmenting the price of his goods, ought not the creditor to have a reciprocal advantage, in augmenting the value of his debt, which is set off by those goods? would this contravene the rule qui sentiat onus sentiré debet et com-modum; or equality *is equity? a man, who in 1776 had bought from another a flock of sheep, agreeing to pay for them in kind on the first day of janu-ary, 1779, must have returned an equal number, and of equal value, although at the date of contract he could have bought the sheep for 1}$ dollar each, but at the time of restitution could not buy them for less than 10 dollars each; because the value of sheep remained the same, although that of the money had varied: and no reason can be assigned, where money was to be paid for the sheep, why the money when paid should not be made equal in value to what it was when the sheep -were delivered, supposing the act of general assembly, as the court of appeals suppose it, not applicable to the present question.
The court of appeals, about the middle of their decree, seemed cautious of establishing precedents, no doubt that inferior judges might not be misled by them, near the end of it, after dividing an account, of 14 articles, into three unequal parts, and with one of those setting off some of the principal and interest of a debt, and with another setting off some of the interest of what remained of the same debt, both these parts at the nominal value during the time of depretiation, and with the third part, subjected to the scale of depretiation, setting off some of the aforesaid debt, at tne reduced value; after these various valuations and applications of articles in the account, they add these words, ‘a precedent for such distinction between principal and interest having, AS JS SUPPOSED, been furnished in this court,’ leaving the existence of such a precedent incertain.
That such a precedent, which is only supposed, did not exist being possible; and the decree in the principal case not restraining inferior courts from deciding-questions of this kind in another mode, the H. C. C. will probably refer the decision of such as may occur there hereafter to juries, directing issues to be made up for that purpose.

[The main difference In this case between the Chancellor and the Court of Appeals seems to be as to the facts: how far B. had, or not, authorised a particular application of his payments; or how far S. had, or not, indicated that he understood what application thereof had been intended. Th e Chancellor proceeded upon the idea that B. had left S. at liberty what application thereof to make. The Court of Appeals, however had a different one. These.are the facts derived from 1 Wash. 138.
B. and the endorsers on the protested bill having: fixed with S. the sum due by said bill, in current money, sent by S. to the Clerk of King1 William Court, where suit on the bill was pending1, a note agreeing-to confess judgment for the amount due, —£778. This was in 1776; but S. held up this note till 1784; when, without notice to any of the parties, he procured a judgment to be entered up for £361, the balance.then due him, per his own statement. B. reversed this judgment. S. then brought suit v. H. alone and obtained judgment in 1787, for £1400
H. obtained an injunction, alleging that the -bill had been nearly, if not wholly, paid by B., and that through mistake of his counsel, office j udgment b ad been obtained and confirmed against him. S. answered and the H. C. C. directed B. to be made a co-plaintiff. B’s bill stated same facts set forth by H. and that he had, in bonds, (in 1783,) which were to be applied to the protested bill paid £935, and that S. owed him on account, which should also have been applied to that debt. S. denied that B. had directed any application of said bonds to said protested bill: and said that he had applied £661 of those bonds to said bill; and part of the residue, by B’s particular directions, to B’s bond, in which C. was surety; and the balance to a private debt of B The Reporter says that there was no evidence that B. directed the application of any payment to the credit of the judgment on the protested bill. It was proved that immediately after the payment, he sent a message to his endorsers that he had discharged the judgment; but this was not delivered in the presence of S. Sometime after the bonds were received by S. he had declared that he should lose money by taking them; but it did not appear whether this was before or after the j udgment was entered up in 1784. As late as 1786, S. enclosed to B., B. & C’s bond and some accounts, which B. received without objection; and sometime afterwardsS. had said that he had been advised to give up those papers to B. and rest on the protested bill.
From these facts, the two courts had to decide, how the bonds paid to S. by B. should be applied. The Chancellor has spoken for himself. Pendleton, Pres., said for the Court of Appeals:
"The rules, respecting the application of payments, are not disputed; but the question is. how they are to apply, under the circumstances of the present case? How Mr. Braxton intended it, appears from his declaration to Mr. Butler, made recently after the payment. It was natural that he should apply them to the relief of his friends, who stood bound as his securities: and in the choice between them, he might have motives for preferring the endorsers of his bill; and accordingly, when these bonds were paid in 1783, Mr. Braxton sent a message to the indorsers, that he had made this payment on account of the bill. This message was not delivered in the presence of. nor was it communicated to, Mr. Southerland, so as to fix his assent to that application. But the appellants suppose, that'his assent is to be inferred, 1st, from Southerland’s declaration, (which is proved,) that he should lose by taking those bonds — and 2dly, from Mr. Southerland’s application to Mr. Claiborne 1784 (which is also proved,) warning him of his danger, and preparing him for the expected payment: and tho’, he afterwards said, that he believed this bond might be paid, yet he refused to give it up. and never did so.’ till 1786, when the judgment was reversed; then bj’ the advice of his counsel, he sent it with other papers to Mr. Braxton.
"Although, if the debtor neglect to make the application at the time of payment, the election is then cast upon the creditor, yet it is incumbent upon the latter, in such a case, to make a recent application, by entries in his books or papers, and not to keep parties and securities in suspense, changing their situation from time to time, as his interest, governed by events, might dictate. — The endorsers were made easy by the message from Mr. Braxton, “that the payment was applied to their relief,’ and might in consequence of it. have declined asking for counter security. On the other hand, Claiborne was not deceived, because it does not appear, that he considered his debt as discharged by those bonds.
“Besides, it is more probable, that so large a payment would be applied to the credit of a still larger liquidated debt, than that it should be split, and Placed part of it to the credit of a small bond account. and the residue to this large bond.
“Upon the whole, we are of opinion, that the payment should be applied to the bill.” 1 Wash, 132-33. —EdJ -Note in edition of 1852.

 If among1 them such a rule be, a PRECEDENT for it would probably have been FURNISHED.— Note in edition of 1795.

 In syllogismo fit recluctio propositionnm ad principia per propositiones medias, liaee antem -ivo inveniendi sive probanas forma in scientiis popu-laribus (veluti ethicis, politicos, legtbns, el. huius-modi) locnm Ha loot. Fr. Bacon de augmentis scientiarum, lib. V. cap. II. — Note in edition of 1705.